to the next matter, which is U.S. v. Jaquan Walker. Good morning. My name is Molly Corbett. I'm an assistant federal public defender in the Northern District of New York, and I represent the appellant Jaquan Walker. The Troy police officers who committed a stop on September 2nd violated Mr. Walker's Fourth Amendment constitutional rights. The stop that they committed was without reasonable suspicion, and the evidence that was obtained and derived from that stop should have been suppressed. In not suppressing the evidence, the district court committed legal erroneous – made legally erroneous conclusions and legally erroneous findings of fact. Did the district court consider the attenuation doctrine that the government stresses here on appeal? I was not clear about whether this was raised below and just not discussed by the district court, or whether the government raised it for the first time on appeal. And then I noticed that you didn't claim that it was waived in your papers by the government. So what is the status of that argument? The government did not raise the attenuation doctrine on the – at the district court level, and it was not discussed by the district court as part of their determination. Because of the de novo standard, the government did raise it here, but it is our contention that that attenuation doctrine does not apply. You're not arguing that the government waived the argument? Is that right? Well, if – because wouldn't you have had an opportunity then to develop facts regarding a pattern and practice of activity by the Troy Police Department that, you know, the record – you make assertions, but the record doesn't really support those about how the police department operates. And that didn't come up until the hearing itself. And the government did not bring up the actual attenuation doctrine, the intervening circumstance of the finding of the warrant itself. It simply relied on the fact that there was reasonable suspicion for the stop. And I'll ask opposing counsel, what was the reasonable suspicion they claim for stopping these two men? So the reasonable suspicion was supposedly formed from a photo that had been supplied in relation to a request for identification. We have a copy of the photo. I don't know how you could recognize anyone from that photo. And that was part of the argument at the lower level was that the photo itself did not necessarily reveal distinguishing features to the extent that could provide any sort of – Your argument is that there was no reason even for a Terry stop. Absolutely. Not only was there no reason, but the photo that was supplied and relied upon by the district court could not provide reasonable suspicion, first because it was not attached to a criminal event. If there was reason for a Terry stop, then everything falls apart. If there was no reason for a Terry stop, then we come to the question of whether there is enough of a separation, attenuation, whatever you want to call it, between that and the finding that your client was under an arrest warrant, right?  Yes. And if that was sufficiently separate from, then the fact that the Terry stop was wrong doesn't matter, but you say that that wasn't sufficiently separate. It was not sufficient, according to what the government has raised. This case is sufficiently distinct from the Supreme Court decision of Utah v. Strafe, which found that an intervening circumstance had attenuated the illegal stop from the evidence found. Why isn't this an intervening circumstance? In Utah v. Strafe, the police officer who committed the stop had firsthand factual knowledge after intermittently surveilling what was thought to be a drug house. And the court found that he had acted in good faith in stopping the individual, Mr. Strafe. They conceded that he didn't have reasonable suspicion, though, right? The government in Strafe said, yes, we don't have reasonable suspicion. They did end up conceding, but the court itself found that their actions were in good faith, as opposed to purposeful or flagrant misconduct, which is also factually relevant in this circumstance, as Judge Carney has raised previously, by the testimony of the police officers who consistently testified to practice known as a stop-out, wherein an individual is identified, stopped, requested for their identification, and then a warrants check is conducted. Neither of the officers who testified to the standard in practice testified that that standard necessarily occurs based on reasonable suspicion, which is exactly what happened here. Officer Montanino ordered two other police officers to stop these two individuals, Mr. Walker and Mr. Hopkins, without distinguishing either one of them as being the person he reasonably suspected. And I'm sorry? Is that why he ordered the stop-out, because it was based on the photograph? That's exactly what he said, is that the stop-out was ordered on this photograph. And the photograph itself, in looking at the photograph, did not provide sufficiently distinct recognizable features relevant to either one, but according to Officer Montanino, it was a combination of both of these factors, related to both, that prompted the stop-out that he ordered. So speak again to the distinction with Strieff, because Strieff, again, the government conceded it didn't have reasonable suspicion for doing the stop, but then the Supreme Court found that the presence, the identification of a valid arrest warrant, was an extraordinary intervening circumstance, and that that changed the whole game. Once the warrant was identified, then any previous illegality of the stop was irrelevant to the suppression motion. What's different here? So the factual distinctions in Strieff versus our case, taking the Brown factors into consideration, the government has conceded that the temporal proximity weighs in our favor, as we have argued. There was no later time. But it was also Fast and Strieff. It also was. And that not only was there temporal proximity, but also the police conduct here was purposeful. Officer Montanino ordered the two police officers to stop. I have trouble, I mean, I'm very sympathetic to your argument, but I have trouble given what the Supreme is, Supreme Court is really saying to us in Strieff, and whether what they're saying to us there isn't really meant to apply to this situation as well. It is not really meant to apply to this situation? I fear that it is, that it covers this case as well. Well, also in Strieff, you have to recall that the exceptions to the exclusionary rule at the very heart of that exception is the fact that the societal interest has to be outweighed or the deterrent effect and the societal interest can outweigh that misconduct or that constitutional violation. Part of what you said in your reply brief in distinguishing the case from Strieff is that Detroit police officers' conduct in this instance was part of an intentional police practice that purposefully intercepts individuals, subjects them to police questioning, obtains their ID and runs their names for warrants and so on. The situation that Justice Sotomayor warned against. Exactly warned about. But I was unclear what in the record supports those assertions, that this was a longstanding broad police practice other than some brief testimony about stopouts, that occasionally stopouts happen in Troy. Was there anything more or do you think on a remand, for example, you might be able to deduce more evidence that this is a widespread practice? Well, I think the consistent testimony between the two police officers about how the standard of practice was acted or acted upon. And we would appreciate a remand to further develop if this is something that is a systemic issue within the Troy Police Department. Would you prefer a remand to an outright reversal on the motion to suppress? We believe that this is sufficiently distinct from strafe and that the societal interests outweigh the deterrent effect, outweighs whatever societal cost there might be based on the fact that the police officers were acting in furtherance of what was apparently a regular practice for them. Both Officer Montanino and Officer Fersenetti were specifically clear about how a stopout was to occur. And I would point back to their testimony specifically at, you know, pages 49 to 50 for Officer Montanino and also at page 94 for Officer Fersenetti. And it was an intentional practice and that was one of the specific facts that makes this distinct from strafe. Thank you. You've reserved some time for rebuttal, counsel. We'll hear from the government. May it please the Court. My name is Paul Silver. I appear on behalf of the government. Judge McAvoy did address the attenuation doctrine. That appears in a very brief comment in the Court's decision at A132 where he said, Because the tenant was arrested on an outstanding warrant, he was lawfully searched incident to this arrest, thus the drug evidence was lawfully seized. The parties did not address that. Speak in the microphone, please. I'm sorry, Judge. The parties did not address attenuation. But it doesn't start at the moment when these men were stopped out.  Well, but that's exactly the point of strafe, Your Honor, that assuming for purposes of argument that there was not reasonable suspicion for the stop, the very brief encounter in the neighborhood of a minute before the warrant was discovered is a sufficient event to attenuate. Did Judge McAvoy find that it was a minute? Is against the 10 minutes that the defendant said? Judge McAvoy made no finding on that, Your Honor. When I wrote in the brief that it was about a minute, I cited to the points of the recording submitted by the defense that established those facts. Would it make a difference if it were 10 minutes? I don't believe so, Your Honor. Unless something had occurred within the 10 minutes that made the police conduct so unlawful that the third factor of strafe wouldn't apply. But there's no indication that that occurred. So I'm a little unclear, though. Did the government raise the attenuation doctrine in the district court? The government did not raise it, Your Honor. And why shouldn't we treat it as waived then? Because there are facts that one could develop to determine whether to apply that doctrine. And the district court didn't have those before it, and the defense didn't have an opportunity to develop those facts. Well, the district court did have those facts before. But I would say with respect to waiver, Your Honor, that an appellant cannot rely on something not raised below to seek a reversal of a district court decision. Whereas this court is entitled to affirm a judgment on any ground that's apparent in the record. I'm a little confused about that because attenuation doctrine, whether it's applicable, seems to me fact-dependent. I mean, for example, if it were established that the Detroit Police Department had a practice of stopping people without reasonable suspicion and searching for warrants within a minute and then arresting people based on whether one was identified, that might raise some of the concerns that are discussed, albeit in the defense in Strieff, but that, you know, were not taken into account in the majority opinion. So why should we not treat that as waived? Because it was the defendant's burden to establish any ground in support of suppression in the district court that they felt was appropriate. Why would it need to respond to a ground that the government had not raised? Why isn't it enough for the defendants to say this stop was improper to make their case unless you come in and say, but this is attenuated? Why do they have to do more at that point? Because they knew, as well as anybody else involved in the proceeding below, that following the stop, the arrest warrant was discovered, and could have made the argument that that. Well, but there you can't expect people to make an argument against something that hasn't been made. I mean, it's not that difficult for the government to have said, yes, this was that, but even assuming that it was improper, there was attenuation, and then they answer it. I mean, you're going to ask parties to make counterarguments to arguments that haven't been made? What are they going to say? By my comments, I don't mean to suggest that the government should not have raised the issue. Please don't construe my comments that way. But the facts were known to everybody, and I think the argument could have been made, notwithstanding. What you're really saying is that where it's an issue of waiver or not, we have a substantial amount of discretion on whether we take the argument now or not, and that you are saying that on the facts of this case, we ought to take it. I'm — well, I'm saying that and more, Your Honor. I'm not aware of any case, which may not be indicative of anything, but I'm not aware of any case where the appellee was not permitted to make an argument because the appellee did not make the argument below. I've never seen that, because I'm entitled to bring to the Court's attention any ground, even if it wasn't relied on by the district court, that would permit the court to affirm the judgment. But here the court actually did determine that there was attenuation. I would have liked to have seen a citation to Utah v. Strieff, but the court got it right. And for that matter, at that point, the defendant could have said, are you — excuse me. Let me try to be very clear. Are you saying that since the district court found that the initial Terry's stop was justified, and once they found that it was justified, there was no reason for you to say if they had not found it justified, attenuation would still help us, and therefore on appeal, where they are arguing that the district court was wrong on that, we should look to any ground on which they might be supported? Is that what you're saying? I wish I had said that, Your Honor, but I agree wholeheartedly. I did not make that point, but it's well taken. That's the basic. Right. For the same reason that perhaps the defendant shouldn't have been held accountable for not showing a custom and practice, an unlawful custom and practice of the Troy Police Department, because we didn't argue attenuation. But the whole hearing below was addressed to the issue of reasonable suspicion, whether it existed or not, which I think you actually. Does the government concede there was no reasonable suspicion at the beginning of the stopout? I don't concede it, but I think you would be certainly well within your rights to say that I have, because I didn't try to defend the reasonable suspicion finding by Judge McAvoy. You don't think that the photograph is sufficient to stop two black men walking on the street? No, I think the photograph was sufficient because there was testimony below that the photograph relied on by Detective Montanino was a digital photograph on his phone. But let me ask about the phone, about the photograph. It seemed to me that it wasn't even so clear that the photograph was of someone who was known to have committed a crime. Well, it was taken in the area. The timing wasn't clear. When Sergeant Montanino knew, he didn't know where it had been taken, I think, and he did not know about its relationship to suspect number two. So his own knowledge about what the photograph even signified was, to use the word, attenuated. I agree with you wholeheartedly, and that's one of the reasons I did not argue this. I thought you might ask me, why is there this whole discussion of collective knowledge in my brief? And then I don't do anything with it. But I threw it out there because that's the difficult part about whether there was reasonable suspicion or not. In other words, presumably the detective who forwarded that photograph throughout the Troy Police Department had reasonable suspicion to believe that this individual was involved in the shooting or wouldn't have sent the photograph. The government did not present that evidence. So the question becomes, can Detective Montanino draw reasonable inferences about why the photograph was provided to him? And I'm not certain what the answer to that question is, Your Honor. I think for the reason that it's not a very strong argument, right? Because obviously police are entitled to draw reasonable inferences from the conduct they observe. I don't know if that applies. So... The conduct they observed, they were simply walking. Right. I'm not trying to say that anything that... My problem with that is that anytime some policeman tells some other policeman, go and stop somebody, the person draws a reasonable inference that the first one had that right. And that just doesn't seem to me plausible. And I agree. And I was not comfortable enough with the intricacies of the collective knowledge doctrine to defend Judge McAvoy's determination that there was reasonable suspicion. So there was no reasonable suspicion until the warrant was found through a check. I would... But isn't that prohibited, if there was no reasonable suspicion? No, that's the whole point of Utah v. Streiff, Your Honor, with all due respect. That in the event, and in Utah it was the same situation, a detective thought he had, or a police officer thought he had reasonable suspicion to stop an individual who had left the house that the detective believed was used for drugs. And once he got the... And once he made his Terry stop, he learned of an outstanding warrant for the individual he had stopped. But those facts were not really very well developed in the Streiff decision. I mean, what we know was the government conceded it, but the house had been under surveillance for a week. People have been coming and going, have been conforming to the standard profile of a drug distribution center. And here, in contrast, it's hard to see that there was any basis at all for this stop. It's a distinction without a difference, Your Honor. Because it doesn't matter why there wasn't reasonable suspicion. Leaving aside a question of whether there was flagrant abuse of conduct by the police. But I don't think there's any question but that the police here acted reasonably, even if there wasn't reasonable suspicion. They might have made a mistake in stopping this defendant, but they were reasonable in the way they did it and why they did it. So it really doesn't matter why there was not... Scalia, Your Honor, I'm not so sure that I would buy that they were reasonable. But you say it was not outrageous in the sense that Steve might permit. Right. But did the government contest that there was such a stop out kind of program that was testified to by two officers? I don't think the way I read the short answer is I don't know. I don't believe so, Your Honor. But I'm sorry. No, you don't contest it or no, you believe there was no such program. Well, I don't. If there was such a program, I do believe there was such a program, but it's like saying, you know, when we want to go into a house and search, we search a house. Or when we have an arrest warrant, we go arrest people. No one said that the police, as a matter of practice, without reasonable suspicion, stop people on the street and make them give identification. That's what happened here. You admit they didn't have reasonable suspicion. Yes. Nor would they have stopped him. Yes, Your Honor. But I'm conceding that. But my point is that there is no evidence that there was a practice of stopping people without the requisite level of suspicion. Yes, we have a practice of stopping people and asking them for identification. You don't have to talk about practice necessarily. We have this case in front of us. Well. Where you concede there was no reasonable suspicion, the photograph is not revealing enough to identify any of these two, either of these two black men. There was no reasonable suspicion. They shouldn't have been able to ask for the ID and they shouldn't have been able to do a warrant search. I'm with you up to the last point, Your Honor. Of course. Well, but, but, but, but take it up with the Supreme Court. I'm not being flipped. You know, Utah v. Streiff says that this is permissible. It doesn't say you can stop without reasonable suspicion. It says that if you make that mistake and then learn of the warrant, you may search, you can search pursuant to the warrant. That's where you and I disagree with all due respect, Your Honor. That's the whole point of Utah v. Streiff, subject to Judge Carney's concern as to whether or not there was some unlawful practice that was being carried out in this case, and there's no evidence of that. Well, what we have to do is try to figure out just how far the Supreme Court was going in Streiff. I, I. And that's essentially what I said to opposing counsel, and is, I mean, I don't like Streiff. I'll be quite blunt about it. I think it's wrong. On the other hand. Well, but, but I would say, Your Honor, on this record, Streiff is on all fours with this case. It is indistinguishable. But not really. In Streiff, this man was coming out of a known drug house. Isn't that correct? But it, it doesn't, yes, Your Honor. Here. Well, I, I beg your pardon. These guys were walking on the street. I beg your pardon. He came out of a house that the officer believed was a drug house. That was under surveillance. Yes. So I don't know if we really know it's a drug house. The officer believed it was, and that's what gave rise to the reasoning. Okay. There's no comparable belief here with two guys walking on the street. Well, yes, there is, Your Honor. But this doesn't matter. You're taking me down a road that does not matter. Because the reasonableness of the officer's actions here are, they had a photograph. Officer, Detective, Sergeant Montanino saw these individuals on the street, stopped his car, reviewed the photograph, made a determination that there was a sufficient similarity to find out if one of these two people was the person depicted in the photograph. That was a reasonable action. But if he's wrong, it doesn't matter. For the same reason it doesn't matter in Utah v. Streiff. But in Streiff, the court pointed to an exception if there is flagrant misconduct. And it gave us the reason exactly what Judge Pooler is pointing to, that this was inside a house whose occupants were legitimately suspected of dealing drugs. It was not a suspicionless phishing expedition. And the concerns we've raised about the photos and the stop-out practice that was testified to suggest this is more in the line of flagrant misconduct. And it was what the Supreme Court distinguished as a suspicionless phishing expedition. Concern that was raised here about the quality of the photo by my friend, Ms. Corbett, is misleading. Because we're looking at a photocopy. The photo that Detective, that Sergeant Montanino looked at. Some of us examined that also on the screen and reduced it to, you can reduce it to a telephone size. Yeah, but I think the photocopy that you're looking at, one of the problems that was discussed in the hearing below was that that digital photograph no longer existed. And there was discussion about whether the testimony would be allowed to occur. The photograph that you're looking at, I believe, with all due respect, is not the photograph that Sergeant Montanino was looking at. Well, thank you, Your Honor. Thank you for the extra time. Counsel, you have two minutes for rebuttal. Just to return to the distinctions between Streiff and our case. In Streiff, the Supreme Court specifically found that the officer was negligent, that his acts were negligent in stopping Mr. Streiff. In this case, we have a purposeful stop. Whether or not there was reasonable suspicion or not, or facts supporting the stop, Officer Montanino was going to stop those two individuals, and he ordered Officers Fersenetti and Conway to do so. That's one distinction. The second distinction is that this was based on a practice that was used and testified to both... I can understand what you're saying about practice, whether it's there or not, we'll have to see. But I don't understand the first thing that you said, there was negligence there. What, in each case, the stop was intentional, wasn't it? In the case of Streiff, the Officer Fackrell thought that he had reasonable suspicion. There's no indication here that the officers conducted... You thought that they had reasonable suspicion here? There was... I mean, I understand what you're saying about if there is a practice of doing this, then we may be able to distinguish Streiff. But I'm having a little trouble on saying that if there isn't that practice, this particular policeman didn't think incorrectly that he had reasonable suspicion, as in Streiff. I mean, you know, there are all cases in which the policeman likes to think what he likes to think, and that's that. But I understand your second point, but I have trouble with your first one. Even if this was not negligence, or if Officer Montanino believed he had reasonable suspicion, this is still factually distinct because of the actual amount of time that elapsed between Officer Montanino's decision to search and his order. So, in breaking the causal chain, the decision to stop Mr. Walker preceded the decision to... or whatever was going to happen after that. There was no causal chain. The stop and the dissipation of the reasonable suspicion by the time the officers converged on him and looked at the phone also make this factually distinct because there was nothing there for them to continue into the next segment of their activity with him, which was to run the warrants, aside from the fact that that's what their stop-out activity was going to entail anyway. So that is another area that's factually distinct. The only distinctive feature was that this was a photograph of a black male, and they had two black males standing in front of them, and they damn well were going to search. Exactly. Well, you know, they compared the photo to Mr. Hopkins, his companion, and let him go. Now, whether or not that happened... And, you know, that didn't happen until after the warrant search had been done. So whether there was even a basis to just, you know, to compare that  But from the testimony, it's apparent that they did do that with Mr. Hopkins and let him go. So why that didn't dispel the reasonable... whatever reasonable suspicion they thought they had is, you know, a question for this court as well. I just want to say, as far as the quality of the photograph is concerned, that was on the government to present that at the hearing, and the question was raised. And, you know, lower counsel did object to the quality, and the fact that, you know, this stop was based on something that was coming off a 4.5-inch iPhone screen. So to hold that against us is completely without basis. For these reasons, and for the fact that the exclusionary rule was specifically meant to weigh societal interests and to deter the type of police conduct that is present in this case, I would respectfully request that this court reverse. Thank you. Thank you, counsel. Thank you both. Very interesting case.